Peter J. Mintzer, HSB #08907
SELMAN BREITMAN LLP
600 University Street, Suite 2305
Seattle, WA 98101-4129
Telephone:  206.447.6461
Facsimile:   206.588.4185

Attorneys for Plaintiff ALLIED WORLD
NATIONAL ASSURANCE COMPANY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ALLIED WORLD NATIONAL ASSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>NHC, INC. aka MNS, LTD. dba ABC STORES,<br><br>Defendant. | Case No.    22-cv-00469<br><br>**COMPLAINT FOR DECLARATORY RELIEF** |

## I.    INTRODUCTION

In this action, Plaintiff Allied World National Assurance Company seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 concerning its obligations, if any, to provide insurance coverage to its insured, NHC, Inc. aka MNS, Ltd. dba ABC Stores, in connection with the separate underlying class action lawsuit suit, *Corker, et al. v. Costco Wholesale Corporations, et al*., Case No. 2:19-CV-00290-RSL, pending in United States District Court for the Western District of Washington.

## II.   FACTUAL ALLEGATIONS

### PARTIES

1.      Plaintiff Allied World National Assurance Company ("AWNAC") is a New Hampshire corporation with its principal place of business in the State of New York.  AWNAC at all material times has transacted business in the State of Hawaii.

2.      On information and belief, Defendant NHC, Inc. aka MNS, Ltd. dba ABC Stores (hereinafter, "MNS") is a Hawaii corporation, with its principal place of business in the State of Hawaii.  MNS owns and operates retail stores under the business name "ABC Stores."

### JURISDICTION AND VENUE

3.      This Court has personal jurisdiction over all parties.

4.      In this action AWNAC seeks declaratory relief regarding its obligations for an underlying claim under an insurance policy issued to MNS with relevant limits of insurance in excess of $75,000.

5.      Actual, real and currently justiciable controversies exist between the parties as to the issues described herein.  A declaration from the Court on these issues will permit the parties to order their affairs accordingly.  Under 28 U.S.C. § 2201, the Court has authority to issue a declaratory judgment resolving these controversies.

6.      This Court has subject matter jurisdiction of this action under 28 U.S.C. § 2201 and 28 U.S.C. § 1332 because AWNAC is a citizen of New Hampshire and New York; MNS is a citizen of Hawaii; and the amount in controversy exceeds $75,000.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this action involves a dispute over the application of insurance coverage under policies written out of the State of Hawaii, the alleged events and omissions which gave rise to this claim occurred in this district, and because Defendant is subject to this Court's jurisdiction.

## THE UNDERLYING LAWSUIT

8.     This case arises from commercial umbrella policies of insurance issued by Plaintiff to Defendant and the claims asserted in the separate action, *Corker, et al. v. Costco Wholesale Corporations, et al*., Case No. 2:19-CV-00290-RSL, pending in United States District Court for the Western District of Washington (hereinafter, the "Underlying Lawsuit").

9.     The Underlying Lawsuit is a class action filed by "Claimants" on behalf of coffee farmers that grow coffee in the Kona District of the Big Island of Hawaii. Claimants allege that underlying coffee distributor, wholesaler, and retailer defendants (the "Underlying Defendants"), including MNS, distribute and/or sell coffee described as "Kona" coffee that does not actually originate from the Kona Region of Hawaii.

10.     Claimants allege that certain environmental factors give coffee grown in the Kona District distinctive characteristics in the form of unique flavor, aroma, and mouth feel.  As such, Claimants allege that the "Kona" designation signals to customers that the coffee will have a distinctive flavor profile and that the beans are of the "highest quality," for which customers are willing to pay a premium.

11.     Claimants allege that MNS sells a variety of coffee products throughout the United States through its website and through the ABC Stores retail outlets. Claimants further allege MNS sells or sold products provided by other Underlying Defendants which falsely designated the origin of their "Kona" coffee products on their packaging and description of their products.

12.     Claimants originally alleged that MNS sold mislabeled "Kona" coffee products prepared by three other Underlying Defendants: Mulvadi Coffee Corporation ("Mulvadi"); Pacific Coffee, Inc. ("PCI"); and Hawaiian Isles Kona Coffee, Ltd. LLC ("Hawaii Isles").  Of these three Underlying Defendants whose falsely designated "Kona" products MNS allegedly sold, Mulvadi is the only one

remaining in the Underlying Lawsuit at this time.

13.    On information and belief, PCI and Hawaiian Isles have settled with Claimants, and these settlements included a release of liability for MNS arising from any of PCI's or Hawaiian Isles's respective products.  As a result, the only remaining "Kona" coffee products for which MNS presently faces liability are Mulvadi's products.

14.    Claimants allege that Mulvadi utilizes deceptive marketing, product name and package designs, including the false descriptions of "100% Kona Coffee" or "Pure 100% Kona Coffee," in order to mislead consumers into believing Mulvadi's coffee products only contain coffee from Kona, when those coffee products actually contain ordinary commodity coffee beans.  Claimants allege that chemical testing conducted on Mulvadi's products show that the designation of Kona as the origin of its products is false.

15.    Claimants allege that MNS sells counterfeit "Kona" coffee products supplied by Mulvadi and other coffee suppliers throughout the United States, and that MNS uses Mulvadi's misleading packaging and descriptions in selling these goods on MNS's shelves and its website, and in other advertising.  Claimants allege that MNS wrongfully profits from each sale of the counterfeit coffee product.

16.    The pleadings in the Underlying Lawsuit describe the alleged conduct by MNS as "malicious."  Claimants further allege that MNS is a sophisticated participant in the premium coffee market and that it may utilize professional coffee buyers to source coffee for its products.  Based on this, Claimants assert that MNS knows the true nature of what it is buying and selling.

17.    The Underlying Lawsuit asserts one cause of action against the Underlying Defendants, including MNS, described as "False Designation of Origin, False Advertising and Unfair Competition under Lanham Act § 43(a) (11 U.S.C. § 1125(a))."

18.     The Claimants allege that the Underlying Defendants violated the Lanham Act by falsely advertising and/or designating Kona as the origin of the coffee products they manufacture, distribute and/or sell when such products actually contain "inferior quality" beans from other parts of the world.  They allege the Underlying Defendants also violated the Lanham Act by falsely advertising and/or designating the origin of these coffee products in a way that is likely to confuse or deceive consumers as to the source of the coffee products, and that this false designation has damaged the reputation and goodwill of the Kona name and damaged the market value of authentic Kona coffee.

19.     On information and belief, after being served in the Underlying Lawsuit, MNS knowingly continued to sell and/or advertise the allegedly deceptive Mulvadi coffee products at issue in the Underlying Lawsuit from February 27, 2019 until in or around June 2022.

20.     After being served with the Underlying Lawsuit, MNS tendered notice of the claims to its primary liability insurer, Mitsui Sumitomo Insurance Company ("Mitsui"), and to its umbrella liability carrier, AWNAC.

21.     On information and belief, Mitsui initially denied coverage for the Underlying Lawsuit, but later reconsidered its coverage position at MNS's request. Mitsui is currently defending MNS against the Underlying Lawsuit, subject to a complete reservation of Mitsui's rights.

22.     Upon receiving notice of the Underlying Lawsuit, AWNAC opened a claim, initiated its investigation, and agreed to continue to monitor and evaluate the Underlying Lawsuit subject to a full reservation of AWNAC's rights.  AWNAC issued coverage position letters outlining its reservations of right on January 12, 2021 and November 17, 2021.

**THE AWNAC UMBRELLA POLICIES**

23.    AWNAC issued multiple commercial umbrella liability policies to MNS which were in effect from between February 27, 2015, which is the earliest date from the Claimants are permitted to seek damages, and February 27, 2019, when the Claimants filed the Underlying Action.  These AWNAC policies were all issued under the same Policy No. 0305-1815, renewed for the annual period of December 31st to December 31st, and provided the same material coverage.  All together, these policies are referred to herein as the "Umbrella Policies."

24.    MNS first tendered the Underlying Action under the AWNAC Umbrella Policy in effect from December 31, 2018 to December 31, 2019 (the "2018-19 Policy").  By letter dated January 12, 2021, AWNAC first agreed to monitor the matter under this 2018-19 Policy, subject to a full reservation of its rights.

25.    Subsequently, MNS provided notice to AWNAC that the court in the Underlying Lawsuit had granted the Claimants' request to seek damages dating back to February 27, 2015, and that Mitsui was now handling the case under its own earlier policy in effect as of that date.

26.    On November 17, 2021 AWNAC issued a supplemental reservation of rights letter, advising MNS that, going forward, ANWAC would handle the claim under the Umbrella Policy in effect from December 31, 2014 to December 31, 2015 (the "2014-15 Policy"), but that AWNAC continued to reserve all of its rights.

27.    As they relate to this matter, all the Umbrella Policies, including the 2014-15 and 2018-19 Policies, are issued on the same forms and contain the same material coverage terms, conditions, exclusions, and endorsements.

28.    The Umbrella Policies' coverage terms are contained in form UM 00004 00 (07/08), subject to various endorsements, which provides in part as follows:

## I.   INSURING AGREEMENT – COMMERCIAL UMBRELLA LIABILITY

A.   We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract**.

The amount we will pay for damages is limited as described in Section III., "Limits of Insurance."

B.   This policy applies, only if:

\*        \*        \*

2.   the **Personal Injury and Advertising Injury** is caused by an **Occurrence** that takes place anywhere arising out of your business, but only if the **Occurrence** was committed during the **Policy Period**.

\*        \*        \*

## II.   DEFENSE PROVISIONS

A.   We will have the right and duty to defend any **Suit** against the **Insured** that seeks damages for **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** covered by this policy, even if the **Suit** is groundless, false or fraudulent when:

1.   the total applicable limits of **Scheduled Underlying Insurance**

have been exhausted by payment of **Loss** to which this policy applies and the total applicable limits of **Other Insurance** have been exhausted; or

2. the damages sought because of **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** would not be covered by **Scheduled Underlying Insurance** or any applicable **Other Insurance,** even if the total applicable limits of either the **Scheduled Underlying Insurance** or any applicable **Other Insurance** had not been exhausted by the payment of **Loss**.

\*     \*     \*

D. Except as provided in Paragraph A. above, we will have no duty to defend any **Suit** against the **Insured**. We will, however, have the right, but not the duty, to participate in the defense of any **Suit** and the investigation of any claim to which this policy may apply. If we exercise this right, we will do so at our own expense.

\*     \*     \*

## III.   LIMITS OF INSURANCE

\*     \*     \*

J. We will not make any payment under this policy unless and until:

1. the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by the payment of **Loss** to which this policy applies and any applicable **Other Insurance** has been exhausted by the payment of

**Loss**; or

2.     the total applicable **Self-Insured Retention** has been satisfied by the payment of **Loss** to which this policy applies.

When the amount of **Loss** has been determined by an agreed settlement or a final judgment, we will promptly pay on behalf of the **Insured** the amount of such **Loss** falling within the terms of this policy. An agreed settlement means a settlement and release of liability signed by us, the **Insured** and the claimant or the claimant's legal representative.

29.     The Umbrella Policies' form UM 00004 00 (07/08) also contains the following exclusions:

**IV.    EXCLUSIONS**

\*       \*       \*

U.     **Various Personal Injury and Advertising Injury**

This policy does not provide coverage for **Personal Injury and Advertising Injury**:

1.     caused by or at the direction of the **Insured** with the knowledge that the act would violate the rights of another and would inflict **Personal Injury and Advertising Injury**;

2.     arising out of oral, written or electronic publication, in any manner, of material if done by or at the direction of any **Insured** with knowledge of its falsity;

3.     arising out of oral, written or electronic publication, in any manner, of material

whose first publication took place before the beginning of the **Policy Period**;

4.    arising out of a criminal act committed by or at the direction of the **Insured**;

5.    for which the **Insured** has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the **Insured** would have in the absence of the contract or agreement;

6.    arising out of a breach of contract, except an implied contract to use another's advertising idea in your **Advertisement**;

7.    arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your **Advertisement**; or

8.    arising out of the wrong description of the price of goods, products or services stated in your **Advertisement**.

30.    The Umbrella Policies' form UM 00004 00 (07/08) also defines certain terms which are bolded in the Umbrella Policies, including the following:

## VI.   DEFINITIONS

A.    **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

1.    notices that are published include material placed on the internet or on

similar electronic means of communication; and

2. regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an **Advertisement**.

\* \* \*

H. **Loss** means those sums actually paid as judgments or settlements, provided, however, that if expenses incurred to defend a **Suit** or to investigate a claim reduce the applicable limits of **Scheduled Underlying Insurance**, then **Loss** shall include such expenses.

\* \* \*

K. **Occurrence** means:

\* \* \*

2. as respects **Personal Injury and Advertising Injury,** an offense arising out of your business that causes **Personal Injury and Advertising Injury.** All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

\* \* \*

M. **Personal Injury and Advertising Injury** means injury arising out of your business, including consequential **Bodily Injury**, arising out of one or more of the following offenses:

1.     false arrest, detention or imprisonment;

2.     malicious prosecution;

3.     the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

4.     oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services;

5.     oral or written publication, in any manner, of material that violates a person's right of privacy;

6.     the use of another's advertising idea in your **Advertisement**; or

7.     infringement upon another's copyright, trade dress or slogan in your **Advertisement**.

\*     \*     \*

R.     **Retained Limit** means the greater of the following amounts:

1.     the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** providing coverage to the **Insured**; or

2.     the **Self-Insured Retention** applicable to each **Occurrence** that results in damages not covered by **Scheduled Underlying Insurance** nor any

applicable **Other Insurance** providing coverage to the **Insured**.

S.    **Scheduled Underlying Insurance** means:

    1.     the policy or policies of insurance and limits of insurance shown in the Schedule of Underlying Insurance forming a part of this policy; and

    2.    automatically any renewal or replacement of any policy in subparagraph 1. above, provided that such renewal or replacement provides equivalent coverage to and affords limits of insurance equal to or greater than the policy being renewed or replaced.

**Scheduled Underlying Insurance** does not include a policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

\*    \*    \*

U.    **Suit** means a civil proceeding in which damages because of **Bodily Injury**, **Property Damage**, or **Personal Injury and Advertising Injury** to which this policy applies are alleged. \*    \*    \*

### III.   CAUSE OF ACTION FOR DECLARATORY RELIEF

31.    AWNAC realleges and incorporates by reference the allegations in paragraphs 1 through 30 above.

32.    Currently, the Mitsui primary policy underlying the 2014-15 Policy has not been exhausted, and so AWNAC has no current duty to defend or indemnify MNS under the 2014-15 Policy or other Umbrella Policies.

33.     AWNAC and MNS dispute whether defense and/or indemnity coverage exist under the 2014-15 Policy and/or other Umbrella Policies based on whether the Underlying Lawsuit fails to allege **Personal Injury and Advertising Injury**.

34.     AWNAC and MNS dispute whether defense and/or indemnity coverage exist under the 2014-15 Policy and/or other Umbrella Policies based on the application of one or more exclusions, including Exclusion U(7), which excludes **Personal Injury and Advertising Injury** "arising out of the failure of goods, products or services to conform with any statement of quality or performance made in [MNS's] **Advertisement**."

35.     AWNAC and MNS dispute whether or to what extent defense and/or indemnity coverage exist under the 2014-15 Policy and/or other Umbrella Policies based on MNS's continued knowing advertisement and sale of Mulvadi's "Kona" products after the Underlying Lawsuit was filed on February 27, 2019, to the extent such damages constituted a known loss or loss in progress; triggered one or more exclusions; or are otherwise not entitled to coverage under the policy terms or the applicable law.

36.     There is an actual justiciable controversy between AWNAC and MNS, including whether insurance coverage exists under the 2014-15 Policy or other Umbrella Policies for defense and/or indemnity for the Underlying Lawsuit.

37.     The Court should declare AWNAC owes MNS no duty of defense and/or indemnification for the Underlying Lawsuit.

## IV.    PRAYER FOR RELIEF

WHEREFORE, AWNAC prays for judgment as follows:

1.     For judgment for AWNAC and against MNS;

2.     For a declaration that AWNAC owes no duty to defend or indemnify MNS with regard to the Underlying Lawsuit under its Umbrella Policies, including the 2014-15 Policy;

3.     For costs and fees as permitted by statute and court rule; and

4.     For such other relief as the Court finds just and proper under the circumstances.

DATED this 2nd day of November, 2022.

Selman Breitman LLP

*/s/ Peter J. Mintzer*
Peter J. Mintzer, HSB #08907
pmintzer@selmanlaw.com
SELMAN BREITMAN LLP
600 University Street, Suite 2305
Seattle, WA 98101-4129
Telephone:   206.447.6461
Facsimile:    206.588.4185

Attorneys for Plaintiff ALLIED WORLD
NATIONAL ASSURANCE COMPANY