IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ALLIED WORLD NATIONAL ASSURANCE COMPANY, *et al.*,<br><br>         Plaintiffs,<br><br>    vs.<br><br>NHC, INC., *also known as* MNS, LTD., *doing business as* ABC STORES,<br><br>         Defendant. | Civil No. 22-00469 MWJS-WRP<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## <u>INTRODUCTION</u>

Kona coffee has a "distinctive flavor and aroma" that results from its cultivation in the "volcanic soil, the elevation, and the humidity" of the Kona District of Hawai'i island. ECF No. 131-12, at PageID.5149. It also costs a pretty penny. But Defendant MNS, Ltd.—better known by its retail business name of "ABC Stores"—bought and sold coffee products labeled as "Kona" that contained little to nothing of the real thing. MNS thereby undermined the goodwill and diminished the market share of genuine Kona coffee products. Or so a group of plaintiffs alleged in a federal class action lawsuit brought in the Western District of Washington in 2019.

MNS did not litigate these allegations to a final resolution. Instead, it opted to resolve the case through a settlement in which it promised, among other things, to pay the class action plaintiffs $12 million in damages. MNS then sought to have its

settlement liability covered by its insurers.  Its primary insurer covered the first $1 million.  But its umbrella insurance providers—Plaintiffs Allied World National Assurance Company and Allied World Assurance Company (U.S.) Inc., or "Allied World" for short—refused.  Instead, Allied World brought this lawsuit seeking a declaratory judgment that it does not owe MNS any coverage.  Allied World contends that its insurance policies provide no coverage for liability of the sort at issue here, and even if they did, an exclusion from coverage applies.  In response, MNS brought a counterclaim, alleging (as relevant here) that Allied World has breached the insurance contract by failing to provide coverage.

Before the court are the parties' cross-motions for summary judgment on these claims.  Because the court concludes that an exclusion applies as a matter of law, and because that exclusion bars coverage in its entirety, it GRANTS Allied World's motion for summary judgment and DENIES MNS's cross-motion for summary judgment.

## BACKGROUND

### A.    The *Corker* Lawsuit

The Kona coffee growers filed their putative class action lawsuit on February 27, 2019, in the Western District of Washington.  *See* ECF No. 131-11, at PageID.5079 (initial complaint); *see generally Corker v. Costco Wholesale Corp.*, 585 F. Supp. 3d 1284 (W.D. Wash. 2022).  Because Bruce Corker was one of the lead plaintiffs, the lawsuit has sometimes been called the *Corker* lawsuit.

2

The plaintiffs in the *Corker* lawsuit alleged that "Kona coffee is one of the rarest and most prized coffees in the world." ECF No. 131-12, at PageID.5164. Its production is also naturally limited: it is grown exclusively in the Kona District of Hawaiʻi island, which contains "only 3,800 acres of land cultivated for Kona coffee production." *Id.* The coffee grown there has a "unique flavor, aroma, and mouth feel" that are all the "direct result" of its cultivation in the Kona District's "volcanic soil, elevation, rainfall, proximity to the Pacific Ocean, moderate temperatures, and sunshine." *Id.* at PageID.5165. And so, by telling a consumer that "they are buying coffee grown in the Kona District," a vendor is "tell[ing] consumers that the coffee has a distinctive flavor profile, and that the beans are of the highest quality." *Id.* Naturally, "consumers have been willing to pay a premium for Kona coffee." *Id.*

The *Corker* lawsuit plaintiffs further alleged that although only 2.7 million pounds of authentic Kona coffee are grown annually, "over 20 million pounds of coffee labeled as 'Kona' [are] sold at retail." *Id.* at PageID.5166 (emphasis omitted). Noting that this is "physically impossible," the complaint charges that "someone is lying about the contents of their 'Kona' products." *Id.*

MNS—along with its supplier, Mulvadi Corporation—was named in the *Corker* lawsuit as one of the defendants alleged to be "sell[ing] packaged coffee products that are presented to consumers as Kona coffee, but that actually contain cheap commodity coffee beans." *Id.* "Some packages contain trace amount[s] of Kona coffee, while other

3

packages contain no Kona coffee at all." *Id.*  These actions, the complaint alleged,

"cause[d] significant harm to legitimate Kona farmers." *Id.*  For one thing, "flood[ing]

the market with what appears to be Kona coffee" has the effect of "push[ing] prices

down sharply." *Id.*  For another, by "selling run-of-the-mill commodity coffee and

labeling it as Kona coffee," MNS, Mulvadi, and the other named defendants allegedly

damaged the goodwill and reputation of Kona coffee.  *Id.*  That is because a "consumer

who tries that inferior product, thinking it is Kona coffee, will conclude that Kona coffee

is not worth a premium price" and "will be unwilling to pay a premium price for Kona

in the future." *Id.*

Based on these allegations, the Kona coffee farmers alleged that the named

defendants in the *Corker* lawsuit had violated the Lanham Act, 15 U.S.C. § 1125(a),

through false designations of the origin of products, false advertising, and unfair

competition.  *Id.* at PageID.5210-12.  In light of the four-year statute of limitations, the

district court limited discovery to the period after February 27, 2015, and it certified a

class dating back to that same date.  ECF No. 131, at PageID.4805 (Def.'s Concise

Statement of Facts (CSF) ¶ 37).

### B.    MNS's Motion to Dismiss in the *Corker* Lawsuit

MNS and the other retailer defendants in the *Corker* lawsuit moved to dismiss the

complaint in June 2019.  ECF No. 129-14, at PageID.4658.  They argued, among other

things, that "Plaintiffs do not allege that the Retailer Defendants—as opposed to those

defendants who manufactured the products—made any statements, much less

misleading ones." *Id.* And so "[e]ven if, as Plaintiffs dramatically claim, 'someone is

lying,' . . . the Retailer Defendants are not that 'someone.'" *Id.* For that reason, MNS

and the other retailers sought the dismissal of the Lanham Act false advertising claim

against them to the extent they had acted purely in their role as retailers. *See id.* at

PageID.4661-63.

On November 11, 2019, the district court granted the motion and dismissed the

false advertising claim to that extent. ECF No. 129-15, at PageID.4693. The district

court noted that under the Lanham Act, a false advertising claim requires "a false

statement of fact by the defendant in a commercial advertisement about its own or

another's product." *Id.* at PageID.4684 (quoting *Skydive Ariz., Inc. v. Quattrocchi*, 673

F.3d 1105, 1110 (9th Cir. 2012)). And the court explained that "[t]o the extent that the

moving defendants are merely retailers of products manufactured, produced, and

packaged by third parties, the issue is whether they made a false statement of fact in

commercial advertising when they put the third-party vendor's product on their

shelves or websites." *Id.* (footnote omitted). Although the court recognized that

"[t]here is limited case law on this subject" and that "the Ninth Circuit has not weighed

in on this issue," it concluded that retailers are not liable for false advertising under the

Lanham Act "because they do not make a false statement simply b[y] displaying or

5

selling a product that was falsely labeled by another." *Id.* (citing *Outlaw Lab'y, LP v.*

*Shenoor Enter.*, 371 F. Supp. 3d 355, 362-68 (N.D. Tex. 2019)).

At the same time, the district court cautioned that it "d[id] not mean to imply

that a retailer can never be held liable on a false advertising claim under the Lanham

Act," and that "[i]f, for example, a retailer controls or participates in the creation of the

offending label or creates additional marketing materials for a product that amplify the

manufacturer's misrepresentations, imposition of liability for false advertising may be

appropriate." *Id.* at PageID.4685. The district court merely found that the *Corker*

lawsuit plaintiffs had not "alleged such activities on the part of the moving defendants

to the extent they were simply retailing products produced, manufactured, and

packaged by third parties." *Id.* at PageID.4686. Accordingly, the district court ruled

that the "false advertising claims against the retailer defendants, acting solely in their

roles as retailers, [could] not proceed." *Id.*

### C.    MNS Seeks Indemnification from its Insurers

After it was served with the complaint in the *Corker* lawsuit, MNS sought a

defense and indemnity from its primary insurer, Mitsui Sumitomo Insurance USA Inc.,

and MNS also notified its umbrella insurer, Allied World. ECF No. 131, at PageID.4805

(Def.'s CSF ¶ 34).

Mitsui had issued one-year primary insurance policies covering MNS for each

year between December 31, 2014 and December 31, 2022, and Allied World had issued

6

one-year umbrella policies for each year between December 31, 2009 and December 31, 2019. *Id.* at PageID.4799 (¶¶ 2-3). In broad strokes, this meant that Mitsui had the principal obligation to indemnify MNS for any covered liability up to the $1 million liability limit of each policy, and Allied World had the backup—or umbrella— obligation to cover any leftover covered liability up to the $25 million liability limit of each policy. *Id.* (¶¶ 2, 4); *see generally* 4 New Appleman Law of Liability Insurance § 41.03[1] (2025) (describing umbrella insurance and its relationship to primary policies).

In a responsive letter dated January 11, 2021, Allied World noted that Mitsui had not yet covered the first $1 million of any liability, and that Allied World therefore had "no current duty to indemnify MNS for the *Corker* lawsuit under the Allied World umbrella liability policy." ECF No. 131-27, at PageID.5388. Allied World recognized that since the *Corker* lawsuit involved allegations concerning "certain marketing and public-facing product descriptions," there was "potential coverage" under the provision of its umbrella policy that covered liability for "the use of another's advertising idea in your Advertisement" or "infringement on another's copyright, trade dress or slogan in your Advertisement." *Id.* at PageID.5399. At the same time, Allied World "reserve[d] all rights to perform its own evaluation regarding the potential for coverage," which it would do only "if and when Allied World's duties to defend or indemnify are triggered." *Id.* at PageID.5400.

7

Allied World's January 11, 2021 letter also advised MNS that even if a coverage

provision did apply to the *Corker* lawsuit, an exclusionary provision might also apply.[1]

*See id.* at PageID.5401-02.  Among other things, Allied World identified (1) its policies'

exclusion from coverage for occurrences committed prior to a policy period, and (2) the

exclusion for liability "arising out of the failure of goods or products 'to conform with

any statement of quality or performance made in your Advertisement.'"  *Id.* at

PageID.5401 (emphasis omitted).  Allied World made clear that if "it is determined that

any one or more of these exclusions apply, Allied World reserves all rights to limit or

even exclude coverage, as appropriate."  *Id.* at PageID.5401-02.

### D.    Allied World Files Suit in the District of Hawai'i

Allied World eventually opted to exercise the rights it had reserved.  On

November 2, 2022, it filed the present lawsuit in this district, relying on diversity

jurisdiction under 28 U.S.C. § 1332 and seeking a declaratory judgment that it "owes no

duty to defend or indemnify MNS."  ECF No. 1, at PageID.14.

In its complaint, Allied World alleged that it had no defense or indemnity

coverage obligation under its policies because the settlement liability did not arise out

---

[1]    While a policy's "coverage provisions" describe "in the first instance the
circumstances under which the insurer will be required to defend and indemnify the
liability of the policyholder," most policies also contain "exclusionary provisions, which
negate coverage in certain prescribed circumstances, even though the coverage
provisions would otherwise afford coverage."  1 New Appleman Law of Liability
Insurance § 3.03[2]-[3] (2025).

of the "use of another's advertising idea in [MNS's] Advertisement" or "infringement upon another's copyright, trade dress or slogan in [MNS's] Advertisement." *Id.* at PageID.12 (emphases omitted). Allied World further alleged that certain exclusions applied, including that the advertising injury arose "out of the failure of goods, products or services to conform with any statement of quality or performance made in [MNS's] Advertisement." *Id.* at PageID.14 (brackets in original).

E.    **MNS Settles the *Corker* Lawsuit**

Meanwhile, the *Corker* lawsuit was still pending against MNS in the Western District of Washington. Other defendants settled and MNS's supplier—Mulvadi—filed for bankruptcy. *See* ECF No. 146-4, at PageID.5893. This meant that MNS was the last defendant set for trial.

In December 2022, the *Corker* lawsuit plaintiffs moved for partial summary judgment against MNS on the ground that it was joint and severally liable for the damages caused by Mulvadi. *See* ECF No. 146-4. The plaintiffs argued that "undisputed evidence establishes that MNS was an active partner in Mulvadi's scheme to flood the market with fake coffee, collaborating with the supplier to produce marketing," as well as "lending its name and reputation to those marketing efforts." *Id.* at PageID.5893; *see also id.* at PageID.5894 ("MNS, despite lending its name and efforts to joint marketing, admittedly did nothing to verify the origin of its Kona coffee products, even after this lawsuit was filed."); *id.* at PageID.5898 ("MNS was no passive

9

middle-man retailer, but instead an active partner with Mulvadi in the campaign to
maximize sales of Mulvadi coffee.  MNS regularly collaborated with Mulvadi in
developing marketing materials for Mulvadi coffee . . . Mulvadi advertising commonly
featured MNS's logo and slogan . . . [And] MNS's 30(b)(6) deponent agreed that the
company's internal emails 'demonstrat[ed] MNS's involvement with Mulvadi and
Mulvadi promotion'" (brackets in original)).

The district court ultimately had no occasion to rule on this motion.  In February
2023, MNS and the *Corker* lawsuit plaintiffs participated in an in-person mediation
session.  ECF No. 131, at PageID.4806 (Def.'s CSF ¶ 42).  Mitsui's claims adjuster
attended the mediation.  *Id.* (¶ 43).  Allied World sent its coverage counsel to the
mediation, though it declined to send its claims adjuster.  *Id.* at PageID.4807 (¶ 44); *see
also* ECF No. 147, at PageID.6055 (Allied World responding to MNS's concise statement
of facts and noting that its "claim analyst" did "participate[] in the mediation by
phone").  At the conclusion of the mediation, the mediator proposed a $12 million
settlement between MNS and the *Corker* lawsuit plaintiffs.  ECF No. 131, at PageID.4806
(Def.'s CSF ¶ 47).  MNS and the *Corker* lawsuit plaintiffs accepted the proposal.  *Id.*

A settlement agreement was signed in April 2023.  *See* ECF No. 146-14, at
PageID.6034-44.  The agreement memorialized that "MNS has concluded that, despite
its belief that it is not liable for the claims asserted and has good defenses thereto, and
without admission of any wrongdoing of any kind, it is in its best interests to enter into

this Agreement to avoid the time, expense, and uncertainty of litigation."  *Id.* at

PageID.6034.  In exchange for the $12 million in damages, as well as an agreement to

take concrete steps to ensure the integrity of any "Kona" coffee products it sold, the

*Corker* lawsuit plaintiffs agreed to a full and irrevocable "release and discharge [of] all

Settled Claims" against MNS.  *Id.* at PageID.6038.  The Settled Claims were defined as

"any and all actions, claims, demands, rights, suits, or causes of action, whether

asserted or not asserted, that arise from or relate to the allegations made or conduct

described in" the last operative *Corker* lawsuit complaint, "including but not limited to

allegations related to the labeling, packaging, advertising, promotion, branding,

marketing, manufacturing, design, formulation, distribution or sale of coffee labeled as

'Kona,' regardless of the statute, regulation, common law legal theory, or other legal

basis on which the allegations may be asserted."  *Id.* at PageID.6039.

     The parties filed the settlement agreement on April 23, 2023, and the district

court issued an order granting its preliminary approval to the agreement two days later.

ECF No. 129-18, at PageID.4739.  After a hearing on the proposed settlement on

September 21, 2023—at which interested parties were afforded an opportunity to be

heard, *id.* at PageID.4740—the district court granted the parties' motion for final

approval of the settlement and entered final judgment and an order of dismissal, *id.* at

PageID.4741-43.  In granting that motion, the district court found that the settlement

agreement was fair, reasonable, and adequate; that it would "bestow a substantial

economic benefit on the Settlement Class, result in substantial savings in time and

money to the litigants and the Court and will further the interests of justice"; and that

"the Settlement is the product of good-faith arm's length negotiations between the

Settling Parties." *Id.* at PageID.4741.

MNS then turned to its insurance companies. Mitsui agreed to cover $1 million

of the settlement amount under its policy for the December 31, 2014 to December 31,

2015, period. ECF No. 131, at PageID.4806 (Def.'s CSF ¶ 43). But Allied World declined

to cover the remaining $11 million, and so MNS covered that liability out of its own

pocket. *Id.* at PageID.4807-08 (¶¶ 47, 49).

### F.    Recent Developments in this Case

After declining to provide coverage for MNS's settlement liability in the *Corker*

lawsuit, Allied World filed an amended complaint in this action in February 2024,

alleging an additional and broader ground for its requested relief: that Mitsui's $1

million coverage limit should be renewed in each of the eight years implicated by the

class action settlement, such that Allied World would owe no indemnification until

Mitsui paid a total of $8 million. *See* ECF No. 61, at PageID.2108-10, 2112-13.

At that point, MNS filed a counterclaim alleging that Allied World (1) breached

its contractual duty to indemnify MNS and (2) acted in bad faith when dealing with

MNS leading up to, during, and after the *Corker* settlement mediation. *See* ECF No. 62.

MNS seeks a jury trial for compensatory and punitive damages on both of these claims. *Id.* at PageID.2875.

In July 2024, Allied World filed a motion to bifurcate Count II of Defendant's counterclaim, which is MNS's bad faith claim. ECF No. 72. The court held a hearing on the motion on September 19, 2024, ECF No. 88, and granted the motion for bifurcation on September 26, 2024, ECF No. 90. As the court explained, "[t]rial will be scheduled, and discovery will commence," on MNS's bad faith counterclaim only after Allied World's request for declaratory relief and MNS's breach of contract counterclaim have been resolved. ECF No. 90, at PageID.3451.

Now before the court are the parties' cross-motions for summary judgment on Allied World's request for declaratory relief and MNS's breach of contract counterclaim. *See* ECF No. 128 (Allied World's motion for summary judgment); ECF No. 130 (MNS's motion for summary judgment). The court held a hearing on these motions on June 26, 2025.[2] ECF No. 167.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where a movant shows there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law.

---

[2]    MNS has not argued that different legal standards should apply to Allied World's declaratory judgment suit and its breach-of-contract counterclaim. Nor has MNS identified any factual disputes unique to its breach-of-contract counterclaim. Accordingly, the declaratory judgment claim and the breach-of-contract claim will rise or fall here on the same facts and law.

Fed. R. Civ. P. 56(a).  Each party bears the burden of production and the ultimate

burden of persuasion on their own motion.  *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,

210 F.3d 1099, 1102-03 (9th Cir. 2000).

A court may not grant summary judgment if the evidence could be subject to

conflicting interpretations, which could lead to different understandings of a material

fact.  *See United States v. Perry*, 431 F.2d 1020, 1022 (9th Cir. 1970).  Questions of

credibility, moreover, must be reserved for a jury.  *T.W. Elec. Serv., Inc. v. Pac. Elec.*

*Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  And the court must construe all facts

and draw all inferences in favor of the nonmoving party.  *Id.* at 630-31.  Where,

however, a case can be resolved on legal grounds—meaning there is no genuine factual

dispute that would be material to the outcome—summary judgment is appropriate.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## DISCUSSION

The parties cross-motions for summary judgment tee up two questions:  First, do

Allied World's umbrella policies provide coverage to MNS for the excess $11 million in

settlement liability?  Second, if they provide coverage, do the policies nonetheless

contain any exclusions that apply and therefore negate coverage?  A different party

bears the burden on each question:  MNS, the insured, bears the burden of establishing

that the coverage provisions apply, while Allied World, the insurer, bears the burden of

establishing that an exclusion applies.  *See N. River Ins. Co. v. H.K. Constr. Corp.*, 462 F.

Supp. 3d 1080, 1086 (D. Haw. 2020), *aff'd*, No. 20-16207, 2021 WL 2935964 (9th Cir.

July 13, 2021).

### A.    Coverage

We begin with the dispute over coverage.  Each of Allied World's umbrella

policies with MNS provides liability coverage for "Personal Injury and Advertising

Injury," and the parties' dispute centers on the proper interpretation of this provision.

Allied World argues that MNS's liability in the *Corker* lawsuit was not the result of an

advertising injury within the meaning of the policy, and MNS counters that it does.

1.  The threshold task in resolving this dispute is to pin down the proper

substantive law.  This action is in federal court on diversity jurisdiction.  And that form

of jurisdiction "provides an alternative forum for the adjudication of state-created

rights, but it does not carry with it generation of rules of substantive law."  *Snead v.*

*Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090 (9th Cir. 2001) (cleaned up).  Instead,

"federal courts sitting in diversity apply state substantive law."  *Id.* (cleaned up).

Recognizing as much, in their motion papers, both parties accept that Hawaiʻi state law

governs here.  What this means, as a practical matter, is that the decisions of the

Hawaiʻi Supreme Court are binding, and when there is no case law on point, the court

"must predict how the state supreme court would decide the issue, considering as

guidance other Hawaiʻi court decisions, as well as decisions from other jurisdictions,

15

statutes, treatises, and restatements." *DelaRosa v. Liberty Mut. Ins. Co.*, 749 F. Supp. 3d 1103, 1107 (D. Haw. 2024).[3]

Under Hawai'i law, insurance policies are "subject to the general rules of contract construction," meaning that "the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended." *Dairy Rd. Partners v. Island Ins. Co.*, 92 Hawai'i 398, 411, 992 P.2d 93, 106 (2000) (quoting *First Ins. Co. of Haw. v. State*, 66 Haw. 413, 423-24, 665 P.2d 648, 655 (1983)). But those general rules of contract construction come with a gloss in the insurance context: the Hawai'i Supreme Court has "long subscribed to the principle that" insurance policies "must be construed liberally in favor of the insured and [any] ambiguities [must be] resolved against the insurer." *Id.* at 411-12 (quoting *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 67 Haw. 203, 209, 684 P.2d 960, 964 (1984) (brackets in original)). Ultimately, the goal of this gloss is to construe policies "in accord with the reasonable expectations of a layperson." *Sturla*, 67 Haw. at 209, 684 P.2d at 964.

---

[3]    While this court may certify a legal question to the Hawai'i Supreme Court, it need not do so where "the answer is reasonably clear and the court can, using its best judgment, predict how the Hawai'i Supreme Court would decide the issue." *Roe v. Ram*, No. CIV. 14-00027, 2014 WL 4276647, at *8 (D. Haw. Aug. 29, 2014). And here, Hawai'i state law is settled on what standards generally apply when reviewing insurance policies, such that the court need only apply these settled principles to the particulars of the policies at issue.

2.  Having resolved the threshold choice-of-law question, we now arrive at the
heart of the parties' coverage dispute:  Has MNS met its burden of establishing that the
claims it settled in the *Corker* lawsuit qualify as claims for which coverage is available
under the "Advertising Injury" coverage provisions of Allied World's umbrella
policies?  Answering the question requires two steps:  first, identifying the settled
claims for which MNS genuinely faced the possibility of liability; and second, assessing
whether those settled claims fall within the scope of the "Advertising Injury" coverage
provision.

a.  The *Corker* lawsuit plaintiffs alleged that MNS (and Mulvadi) violated the
Lanham Act, 15 U.S.C. § 1125(a), through false designations of the origin of products,
false advertising, and unfair competition, focused on conduct dating back to
February 27, 2015.  And at the summary judgment stage in the *Corker* lawsuit—on the
eve of the eventual settlement—the plaintiffs also argued that MNS was jointly and
severally liable for Mulvadi's conduct, given the allegedly "undisputed evidence
establish[ing] that MNS was an active partner in Mulvadi's scheme to flood the market
with fake coffee, collaborating with the supplier to produce marketing, [and] lending its
name and reputation to those marketing efforts."  ECF No. 146-4, at PageID.5893.

When MNS and the *Corker* lawsuit plaintiffs eventually agreed to settle all claims
"that arise from or relate to the allegations made or conduct described in" the operative
complaint, including "allegations related to . . . advertising" and "marketing," ECF No.

17

146-14, at PageID.6039, the terms of their settlement agreement plainly covered the

Lanham Act false advertising claims, as well as the alleged joint and several liability

theory claims.[4]  That is to say, MNS agreed to pay $12 million in exchange for resolving

its legal exposure to these claims.  It follows that the $12 million settlement amount is a

"sum[]" that MNS became "legally obligated to pay as damages by reason of liability

imposed by law," ECF No. 131-7, at PageID.4883—that is, MNS became legally

obligated to pay the settlement amount as a result of the court's September 2023 order

accepting the settlement agreement and entering final judgment.

Allied World resists this conclusion, noting that there has been no finding of

*actual* liability for these Lanham Act claims and no evidence that MNS *would* have been

held liable on these claims had they proceeded to a definitive conclusion in court.  To

the extent Allied World's position is that indemnification requires an actual finding of

liability—or, at least, a finding that there would have been liability—its position is not

tenable.[5]  If insurance coverage in the settlement context were to turn on a prediction

---

[4]    The settlement agreement's language speaks not just to the Lanham Act claims
specifically, but rather to *all* advertising and marketing claims, "regardless of the
statute, regulation, common law legal theory, or other legal basis on which the
allegations may be asserted."  ECF No. 146-14, at PageID.6039.  Apart from the Lanham
Act claims that were asserted in the *Corker* lawsuit, however, MNS does not identify any
advertising-related claims for which it might legally have been held liable by the time of
the 2023 settlement.

[5]    At the hearing on these motions, counsel for Allied World clarified that, in fact, it
does not advocate for a rule requiring a showing of actual liability after a settlement,
but only one that requires genuine potential exposure to have been resolved through

about whether a defendant *would* have been held liable if a case had gone to trial, the

very uncertainty of that prediction—which is presumably one of the factors that would

otherwise induce parties to settle—would encourage them instead to trudge on with the

litigation.  An insured that believes it has a good defense on a covered claim, but that

nonetheless recognizes there is a real risk that it could be held liable for substantial

damages, would be encouraged to litigate a case to its bitter end; losing the case would

be the only way to ensure coverage, for any settlement would leave the insured exposed

to the possibility that a judge would later opine that they would have won had they not

settled.  And so, as one federal court has put it, "requiring the insured to prove actual

liability in the underlying suit would markedly reduce the advantages to the insured of

settling because, faced with the choice of defending the tort action vigorously or settling

it without hope of insurance reimbursement, insureds would tend to choose the

former."  *Catlin Specialty Ins. Co. v. J.J. White, Inc.*, 387 F. Supp. 3d 583, 590 (E.D. Pa. 2019)

(cleaned up).

  This case illustrates that very concern.  In the settlement agreement in the *Corker*

lawsuit, MNS memorialized its position that it did not believe it was liable, and that it

believed it had good defenses to the claims.  *See* ECF No. 146-14, at PageID.6034.

Nonetheless, "without admission of any wrongdoing of any kind," the settlement

---

the settlement.  That concession dovetails with MNS's own position, *see* ECF No. 145, at
PageID.5836-5837, but for completeness, the court addresses the argument that
appeared to have been teed up in Allied World's written briefs.

agreement records MNS's view that "it is in its best interests to enter into this

Agreement to avoid the time, expense, and uncertainty of litigation." *Id.* In approving

the settlement, the district court, too, found that the settlement would result in

"substantial savings in time and money to the litigants and the Court." ECF No. 129-18,

at PageID.4741. Under Allied World's preferred legal standard for indemnification,

however, MNS could not have secured these settlement benefits without imperiling its

ability to obtain insurance coverage. There is no reason to believe that the Hawaiʻi

Supreme Court would seek to discourage settlements in that manner. Nor has Allied

World pointed to one.

Allied World does identify language in the Hawaiʻi Supreme Court's decision in

*Dairy Road Partners*, in which that court stated that an insurer's indemnity obligation

"depends upon the true state of facts surrounding the loss or injury." ECF No. 148, at

PageID.6089 (quoting *Dairy Rd. Partners*, 92 Hawaiʻi at 413, 992 P.2d at 108). And Allied

World notes that the Hawaiʻi Supreme Court drew a distinction between an insurer's

duty to indemnify (which arises only when there is actual liability) and its duty to

defend (which arises so long as there is the possibility of liability). But *Dairy Road

Partners* did not involve a settlement. And in cases that do not involve settlements, it

makes logical sense to say that an insurance company must defend the insured if there

is a possibility of covered liability, but that it need only indemnify the insured if there

actually is covered liability. That is because while an insurance company must provide

a defense even before it has been determined that liability exists (indeed, the point of the defense often is to help avoid or mitigate liability), the insurer generally has no obligation to indemnify unless and until it has been determined through litigation that liability for a covered claim exists (that is, there generally is no obligation to indemnify in anticipation of possible liability).

The analysis is altered when, as here, settlements are involved. In this context, it is no longer a question of possible or potential liability. Actual liability has been affixed, though it is liability flowing from a settlement agreement rather than a jury or judicial determination on the merits. To determine whether that settlement liability flows from a covered claim, a court must inquire not into what has been or would have been resolved on the merits, but what claims the settlement has legitimately and reasonably been designed to cover. For that reason, an insured "does not need to prove that had it not settled, it would have been found actually liable in the underlying lawsuit." *Atl. Specialty Ins. Co. v. Lexington Ins. Co.*, NO 21-cv-0616, 2022 WL 16961371, at *3 (W.D. Wash. Nov. 16, 2022) (discussing Washington state law); *see also Catlin Specialty Ins. Co.*, 387 F. Supp. 3d at 589-90 (explaining that courts in New York, Arizona, Texas, Maine, and California follow the rule that "the insured is not required to prove actual liability to the claimant"). Instead, "after a settlement, the question of whether an insurer must pay the insured's liability (*i.e.* the settlement amount), centers on whether the underlying claims against the insured, for which it was *potentially* liable, were of a

21

type *actually* covered under the policy." *Atl. Specialty Ins. Co.*, 2022 WL 16961371, at *3.

If a party has legitimately and reasonably agreed to pay a sum of money to settle claims

that are covered under an insurance policy, then the "true state of facts surrounding the

loss or injury" support the conclusion that the sum of money is actually covered.

That is not to say that an insured is free to insert covered—but frivolous or

legally barred—claims into the language of a settlement agreement with the aim of

prompting coverage where it is unreasonable or disingenuous to do so.  But the court

predicts that the Hawaiʻi Supreme Court would adopt the view, accepted in a number

of other jurisdictions, that an insurance company has the right to present evidence that

some or all of a total settlement amount should be allocated to the settlement value of

non-covered claims.  *Accord UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins.*, 870 F.3d

856, 863 (8th Cir. 2017) (explaining that the insurance company "bears the burden to

allocate the settlement" between potentially covered and non-covered claims, so long as

it provides "a non-speculative basis to allocate a settlement between covered and non-

covered claims," and that it may prove allocation through "testimony from attorneys

involved in the underlying lawsuits, evidence from those lawsuits, expert testimony

evaluating the lawsuits, a review of the underlying transcripts, or other admissible

evidence").  Allied World does not, however, make an allocation argument of that sort:

it does not contend that the settlement value of advertising claims was only a small part

of the total settlement amount.

22

Allied World does assert that there was no possible liability for any advertisement-related Lanham Act claim as a matter of law. *See, e.g.*, ECF No. 128-1, at PageID.4070-72. And it is true that, given the Hawaiʻi Supreme Court's admonition that indemnification "depends upon the true state of facts surrounding the loss or injury," Hawaiʻi law does not allow an insured to secure coverage merely by adding legally meritless, but covered, claims into a settlement agreement. *Dairy Rd. Partners*, 92 Hawaiʻi at 413, 992 P.2d at 108. A legitimate settlement of a covered claim requires that there was at least some legal possibility that the insured could have lost on that claim. This could be considered a variant of an allocation argument, but one where the argument is that the settlement value of covered claims is zero. And, notably, MNS essentially accepts the point as correct: it acknowledges that an insured that settles a claim must "show *potential* liability based on the allegations and facts known to the insured," ECF No. 145, at PageID.5836 (bold emphasis omitted), which would not be possible to show if the claim were frivolous or clearly meritless as a matter of law.

But Allied World does not persuasively show that there was no possibility of liability for an advertising-related Lanham Act claim in the *Corker* lawsuit. While the district court granted MNS's motion to dismiss the Lanham Act false advertising claim, it did so only to the extent that the claim was brought "against the retailer defendants, *acting solely in their role as retailers*." ECF No. 129-15, at PageID.4686 (emphasis added). And as the *Corker* lawsuit plaintiffs made clear in their motion for summary judgment,

23

their evidence—undisputed, in their view—showed that MNS did not merely act as a retailer, but also participated actively in Mulvadi's advertising and marketing efforts. *See* ECF No. 146-4, at PageID.5897-98; *supra* p. 9-10.  Moreover, the Western District of Washington's dismissal of the Lanham Act false advertising claims against MNS remained subject to appeal as of the settlement date, meaning that there was a genuine possibility that the ruling could have been reversed.  As the district court acknowledged, there was "limited case law" on the subject of whether a retailer could be held liable for advertising when acting merely in its role as retailer, and "the Ninth Circuit has not weighed in on this issue."  ECF No. 129-15, at PageID.4684.  Finally, the *Corker* lawsuit plaintiffs sought to hold MNS jointly and severally liable for Mulvadi's advertising and marketing efforts.  *See* ECF No. 146-4, at PageID.5908-10.  Accordingly, even if the district court had disposed of all Lanham Act false advertising claims against MNS, there remained the possibility of joint and several liability for advertising conduct.

In sum, the court concludes that MNS suffered actual liability flowing from its settlement of advertising-related Lanham Act claims, and at the time MNS entered the settlement, there remained a legitimate possibility that MNS could have been held liable on these claims.

b.  Having identified the settled claims that could possibly qualify for insurance coverage, the court now turns to the question of whether those settled claims fall within

24

the scope of the "Advertising Injury" coverage provision in Allied World's policies.

The "Advertising Injury" provision states, in relevant part:

> [Allied World] will pay on behalf of [MNS] those sums in excess of the
> Retained Limit that [MNS] becomes legally obligated to pay as damages
> by reason of liability imposed by law because of Bodily Injury, Property
> Damage or Personal Injury and Advertising Injury to which this insurance
> applies.

ECF No. 131-7, at PageID.4883 (bold emphases omitted).

The policies define the phrase "Advertising Injury" as an "injury arising out of

your business . . . arising out of one or more of the following offenses":  (i) "the use of

another's advertising idea in your Advertisement," or (ii) "infringement upon another's

copyright, trade dress or slogan in your Advertisement."  ECF No. 131-7, at

PageID.4905.  And the policies further define "Advertisement" as "a notice that is

broadcast or published to the general public or specific market segments about your

goods, products or services for the purpose of attracting customers or supporters."  *Id.*

at PageID.4901 (bold emphasis omitted).  The policies also offer two further

clarifications.  First, the policy includes, as "notices that are published," any "material

placed on the internet or on similar electronic means of communication."  *Id.*  Second,

"regarding web-sites, only that part of a web-site that is about your goods, products or

services for the purposes of attracting customers or supporters is considered an

Advertisement."  *Id.* (bold emphasis omitted).

25

In construing the "Advertising Injury" provision, the parties agree about at least a few things. They agree—or at least do not dispute—that the "Retained Limit" is the underlying or primary insurance available to MNS, which in this case was the $1 million coverage limit under each of Mitsui's primary insurance policies. They agree that no coverage is owed for "Bodily Injury, Property Damage or Personal Injury"; thankfully, none of those things occurred here. They agree that the $12 million settlement liability qualifies as a "liability imposed by law." And no party disputes that the harms of which the *Corker* lawsuit plaintiffs complained "ar[ose] out of [MNS's] business."

Allied World instead centers its challenge to coverage on four features of the "Advertising Injury" provision:

First, Allied World argues that the phrase "another's advertising idea" should be understood narrowly as a "process or invention used to market one's goods." ECF No. 128-1, at PageID.4073 (quoting *Zox LLC v. W. Am. Ins. Co.*, No. 23-55125, 2024 WL 512561, at *2 (9th Cir. Feb. 9, 2024) (cleaned up)). And Allied World contends that the *Corker* lawsuit plaintiffs never claimed that Kona coffee farmers used any "process" or "invention" to market their coffee, let alone that MNS used any such "process" or "invention" belonging to the farmers in MNS's own advertisements. Under this construction of the "Advertising Injury" provision, MNS would not be entitled to

26

coverage because it settled claims that did not involve injury arising out of the use of "another's advertising idea."

This is too narrow an interpretation of the phrase "another's advertising idea." Under Hawaiʻi law, the court must construe coverage provisions "in accord with the reasonable expectations of a layperson," *Dairy Road Partners*, 92 Hawaiʻi at 412, 992 P.2d at 107, and no reasonable layperson would anticipate such a stingy construction of the phrase. Instead, as MNS persuasively argues, an "advertising idea" is better understood as "any idea or concept related to the promotion of a product to the public." ECF No. 145, at PageID.5847 (quoting *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1188 (11th Cir. 2002)).

At a minimum, that broader construction is a reasonable one. And given the Hawaiʻi law principle that insurance policies "must be construed liberally in favor of the insured," it is one the court is compelled to adopt.[6] *Dairy Rd. Partners*, 92 Hawaiʻi at 412, 992 P.2d at 107 (cleaned up).

---

[6]    Nor does the Ninth Circuit's decision in *Zox* require a different result. The Ninth Circuit in that case was not interpreting Hawaiʻi law, but rather California law. And while the circuit noted that one definition of "advertising idea" was a "process or invention," it went on to observe that "California courts have recognized that an 'advertising idea' includes an advertising plan, and the 'manner or means by which another advertises its goods or services.'" *Zox*, 2024 WL 512561, at *2 (cleaned up). The broad understanding of an "advertising idea" as covering the "manner or means" of advertising goods and services, which the circuit adopted as a matter of California law, is not dissimilar from construing it as "any idea or concept related to the promotion of a product to the public," *Hyman*, 304 F.3d at 1188. It certainly is not limited to an

Second, Allied World argues that the word "another's" in the phrase "another's advertising idea" means that the injury must arise from the use of an "advertising idea" that another person owns or in which they hold a proprietary interest of some sort. And because the Kona farmers in the *Corker* lawsuit used the geographic descriptor of "Kona" to refer to their products, but did not hold any legal property right in that term, the use of "Kona" on advertisements cannot be viewed as the use of "another's"—that is, the Kona farmers'—"advertising idea."

But nothing in the language of Allied World's policies requires that the Kona farmers have the exclusive legal right to use an advertising idea. Indeed, nothing in the language of the policies requires them to have any legal right or property ownership at all in the advertising idea. The possessive term in the phrase "another's advertising idea" is readily understood to refer to the factual question of whether another person uses something, rather than the legal question of whether they own it. *See Giovanni Cosms., Inc. v. Arch Ins. Co.*, No. CV 09-5548, 2010 WL 11506876, at *8 (C.D. Cal. Feb. 5, 2010) (recognizing that a concept might qualify as "another's" advertising idea merely by being "associated with" or "in any way unique to" another); *cf. Flodine v. State Farm Ins. Co.*, 2001 WL 204786, at *11 (N.D. Ill. Mar. 1, 2001) (concluding that the alleged offense of "marketing and promotion of products as 'authentic Indianmade,' reasonably

---

"invention," and it is similar to a "process" if that word, too, is understood in its broadest sense.

fall within the common meaning of . . . [misappropriation of] advertising idea"). That broader meaning accords with how language is ordinarily used. For example, when trying to find a place to sit in a coffee shop, one might ask "is this your seat?" When doing so, one is not literally asking if that other person *owns* the seat. And if an impolite customer were to take the seat another was still using, we would naturally say the first customer appropriated "another's" seat. In using the word "another's" in that way, we would be thinking of the second customer (who had originally been using the seat) rather than the coffee shop (the legal owner). In a similar vein, one would naturally say that Kona farmers—who advertise their coffee as "Kona" precisely to signal the high quality and special characteristics of their product—have hit on "Kona" as *their* advertising idea. They use it, and it is *theirs* in that significant sense. And it is theirs even though they have no property right in it.

Moreover, contrary to Allied World's position, Kona coffee farmers are a sufficiently distinct subgroup of producers that uses "Kona" as their advertising idea. It is true that some concepts are simply too common or too widely used to be considered anyone's advertising idea. *See Armament Sys. & Procs., Inc. v. Northland Fishing Tackle, Inc.*, No. 01-C-1122, 2006 WL 2519225, at *3 (E.D. Wis. Aug. 28, 2006) (explaining that labeling products "low calorie" or "sugar free" is "so common that doing so d[oes] not constitute an advertising idea" because an advertising idea must be "capable of being identified as having been created by one party and stolen or appropriated by another"

29

(cleaned up)); *see also Giovanni Cosms., Inc.*, 2010 WL 11506876, at *8 (explaining that
"organic" does not belong to any individual company or group of people because it is
simply a commonly used label meant to conform with government standards).  But the
use of "Kona" is not so generic or generalized.  It instead is more akin to "[g]rowing
cherries in Door County or producing sparkling wine from the Champagne region,"
which "suggests a certain kind of quality that is unique to a distinct subgroup of
producers."  *Armament Sys. & Procs., Inc.*, 2006 WL 2519225, at *2.

For these reasons, the use of "Kona" to advertise Kona coffee products is
properly understood to qualify as "another's advertising idea" within the meaning of
Allied World's policies with MNS.

Allied World counters with *Travelers Indem. Co. of Am. v. Luna Gourmet Coffee &
Tea Co.*, 533 F. Supp. 3d 1013 (D. Colo. 2021), and *L&K Coffee LLC v. LM Ins. Corp.*, No.
22-1727, 2023 WL 3756145 (6th Cir. June 1, 2023), but these cases do not require a
different conclusion.  The policies in those cases were narrower than those at issue here:
they did not provide coverage for any injury arising from the use of another's
advertising idea, but instead limited coverage to any advertisement that "slanders or
libels a person or organization or disparages a person's or organization's goods,
products or services."  *Luna Gourmet*, 533 F. Supp. 3d at 1021; *L&K Coffee*, 2023 WL
3756145, at *2 (analyzing whether there was an advertising injury "arising out of . . . a
publication that disparages a person's or organization's goods, products or services"

(cleaned up)).  Accordingly, to fall within the "advertising injury" provision in those

cases, the insured was obligated to identify "an offense where (1) [it] published material

in its 'advertisement' (2) that disparages the Kona plaintiffs' goods or products." *Luna*

*Gourmet*, 533 F. Supp. 3d at 1022.  And each court found no coverage, not because

advertisements were absent, but because the advertisements did not directly disparage

Kona coffee or Kona farmers.  Allied World was, of course, free to draft an "Advertising

Injury" coverage provision with a similarly restrictive scope.  But it did not do so.  And

the *Luna Gourmet* and *L&K Coffee* decisions therefore lend no support to Allied World's

position.[7]

Third, Allied World points to a different possessive term in the insurance

policies:  that the injury from the use of another's advertising idea must come from that

idea's use in "your"—the insured's—"Advertisement."  ECF No. 131-7, at PageID.4905

(emphasis omitted).  Allied World argues that the *Corker* lawsuit plaintiffs did not

challenge any of MNS's own advertisements.  This is merely a replay of its argument

that advertising claims should not be considered as having formed a legitimate part of

the settlement.  *See supra* p. 18-24.  And it fails for similar reasons:  the *Corker* lawsuit

plaintiffs contended that undisputed evidence supported the finding that MNS was an

---

[7]    Those courts separately considered whether advertising infringed upon
another's "slogan," and concluded that "Kona" was not a slogan.  *See L&K Coffee*, 2023
WL 3756145, at *4; *Luna Gourmet*, 533 F. Supp. 3d at 1025.  The court briefly takes up that
separate issue below.

active participant in Mulvadi's advertising and marketing efforts. *See id.* p. 9-10, 24.

Those allegations are sufficient to render the advertisements at issue as being MNS's

advertisements within the meaning of the policy.

Fourth and finally, Allied World argues that MNS cannot rely on the separate

definition of "Advertising Injury" as covering injury from infringement on a copyright,

trade dress, or slogan.  The court agrees that "Kona" is not a "slogan."  As the Sixth

Circuit explained in *L&K Coffee*, the ordinary meaning of the word "slogan" is a

"distinctive cry, phrase, or motto of any party, group, manufacturer, or person;

catchword or catch phrase."  2023 WL 3756145, at *4 (cleaned up).  While Kona farmers

use the "Kona" descriptor to advertise their products—and to identify their products as

having a high quality—the descriptor is not "a distinct catchword."  *Id*; *see also Luna*

*Gourmet*, 533 F. Supp. 3d at 1025 (explaining that Kona farmers do not use the term

"Kona" as an "advertising tagline").  MNS therefore cannot seek coverage on the

ground that its advertisements infringed a "slogan."  And MNS does not suggest that

any copyrights were involved.  Whether labeling products as "Kona" might qualify as

trade dress is a more difficult question.  But because the court has already concluded

that the settled claims are covered under the "Advertising Injury" provision, it declines

to resolve that question.

32

*    *    *

Construing the insurance policies liberally in favor of MNS—as it must do under Hawaiʻi law—the court concludes that while MNS is not entitled to coverage for claims involving infringement of a "slogan" or "copyright" used by Kona farmers, it is entitled to coverage under the "use another's advertising idea" provision. MNS therefore has carried its burden of showing that the "Advertising Injury" coverage provision in Allied World's policies with MNS provide coverage for the $11 million in excess liability from the settlement sum.

**B.    Exclusions**

That does not end our inquiry, for while a policy's "coverage provisions" describe "in the first instance the circumstances under which the insurer will be required to defend and indemnify the liability of the policyholder," most policies also contain "exclusionary provisions, which negate coverage in certain prescribed circumstances, even though the coverage provisions would otherwise afford coverage." 1 New Appleman Law of Liability Insurance § 3.03[2]-[3] (2025). Allied World argues that two distinct exclusions do indeed apply here: a failure-to-conform exclusion and a first publication exclusion. And Allied World bears the burden of establishing that they apply.

1. The failure-to-conform exclusion provides that Allied World's policy "does not provide coverage" for any "Advertising Injury . . . arising out of the failure of

33

goods, products or services to conform with any statement of quality or performance made in your Advertisement."  ECF No. 131-7, at PageID.4895 (bold emphasis omitted). When interpreting this provision, the court must follow the Hawaiʻi Supreme Court's instruction that while coverage provisions are liberally construed in favor of the insured, "exclusionary clauses are interpreted narrowly against the insurer."  *Aloha Petroleum, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 155 Hawaiʻi 108, 126, 557 P.3d 837, 855 (2024) (cleaned up).

MNS aims to set the bar even higher for Allied World, contending that this court should follow California law to the effect that "[a]n insurer that wishes to rely on an exclusion has the burden of proving, through conclusive evidence, that the exclusion applies in all possible worlds."  ECF No. 145, at PageID.5860 (quoting *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1039 (2002)).  The court need not resolve whether this is the proper lens through which to scrutinize Allied World's arguments, because it concludes that Allied World has amply shown that the failure-to-conform exclusion applies here even under that heightened standard.

The key question is whether the use of the label "Kona" on coffee products amounted to a statement of quality about those products.  Or more precisely, the question is whether MNS settled claims that alleged MNS and Mulvadi were making statements about the quality of their coffee products when they labeled those products as "Kona."  And the allegations in the *Corker* lawsuit make plain that the answer is yes.

34

The *Corker* lawsuit plaintiffs alleged that Kona coffee has a "distinctive flavor and aroma" resulting from its cultivation in the "volcanic soil, the elevation, and the humidity" of the Kona District of Hawaiʻi island. ECF No. 131-12, at PageID.5149. They alleged that "Kona coffee is one of the rarest and most prized coffees in the world" and that by telling a consumer that "they are buying coffee grown in the Kona District," a vendor is "tell[ing] consumers that the coffee has a distinctive flavor profile, and that the beans are of the highest quality." *Id.* at PageID.5164-65. These allegations make plain that when a vendor labels coffee as "Kona," they are making a statement about the quality of the coffee product—they are asserting, in effect, that the coffee they are selling will have the characteristic "unique flavor, aroma, and mouth feel" of Kona coffee. *Id.* at PageID.5165.

And by selling commodity coffee that did not contain much, if any, genuine Kona coffee, MNS and Mulvadi allegedly sold a product that failed to conform with that statement of quality. Here again, the *Corker* lawsuit allegations make this point clear: by "selling run-of-the-mill commodity coffee and labeling it as Kona coffee," MNS, Mulvadi, and the other named defendants allegedly damaged the goodwill and reputation of Kona coffee precisely because a "consumer who tries that inferior product, thinking it is Kona coffee, will conclude that Kona coffee is not worth a premium price" and "will be unwilling to pay a premium price for Kona in the future." *Id.* at PageID.5166. The injury to the Kona coffee farmers in the *Corker* lawsuit, therefore,

35

flowed directly and unambiguously from the alleged failure of MNS's coffee products

to conform with the quality expected of Kona coffee.  Put another way, MNS advertised

that its retail products contained Kona coffee, and therefore possessed the high quality

of Kona coffee, and yet the coffee it sold allegedly failed to conform with that statement

of quality.  And that failure to conform in turn caused the injury that culminated in the

$12 million *Corker* lawsuit settlement.

Against the weight of these allegations in the *Corker* lawsuit, MNS argues that

"Kona" is merely a statement about the origin or source of the product, rather than a

statement of quality.  In support of this contention, MNS cites out-of-circuit district

court decisions that found, in their own unique circumstances, that statements of source

were predominantly about the provenance of products, rather than their quality.  In

*Jewelers Mut. Ins. v. Milne Jewelry Co.*, for example, the district court in the District of

Utah held that a failure-to-conform exclusion did not apply where the underlying

complaint had "allege[d] that Defendants' advertised products, which it asserted were,

but which, in actuality, were not, of Native American origin . . . [therefore] did not

conform with advertised quality or performance."  No. 06-CV-243, 2006 WL 3716112, at

*3 (D. Utah Dec. 14, 2006).  Similarly, in *Flodine*, the district court in the Northern

District of Illinois concluded that the labeling of a product as "authentic Indianmade" is

"primarily concerned with identifying the source or origin of goods, not how well the

goods will perform."  2001 WL 204786, at *11-12.  The logic of *Flodine* is that a consumer

36

might buy an "authentic Indianmade" product, not because of any expectation that it might be of superior or "excellen[t]" quality, but merely because the source or origin of the goods is one that the consumer—whatever the relative quality—is inclined to support. *Id.* at *12. A similar logic could be said to apply whenever a product is labeled as "Buy American" or "Buy Local."

But even assuming that the allegations and record in *Milne Jewelry* and *Flodine* supported the conclusion that "authentic Indianmade" and "Native American origin" were predominantly statements about whom one would be supporting by purchasing a product, it does not follow that a statement of provenance or origin must always be understood that way. When vendors label a wine as "Burgundy," they are not seeking to avail themselves of the peculiar interest of customers in supporting a region in central France; they mean to say to the customer that the wine will possess the features of a high-quality, and therefore more expensive, strain of the product.

The allegations in the *Corker* lawsuit make clear that a similar dynamic attends here. The *Corker* lawsuit did not allege that MNS and Mulvadi were injuring Kona coffee farmers because they were diverting customers who had a peculiar interest in paying premium prices to support Kona farmers. Its allegations were that "Kona" bespoke high quality, and by selling a product that failed to meet that standard of quality, MNS and Mulvadi undermined the premium market for Kona coffee by unfairly leading consumers to conclude that genuine Kona coffee did not meet the

37

quality standard.  Allegations of this nature are not predominantly about the source of a product; they are about the statement of quality that a vendor makes when it calls its coffee "Kona."

Shifting gears, MNS contends that even if "Kona" is a statement of quality, this court should adopt a "magic words" approach to such statements, under which only "express representations of 'quality' or 'performance'" would fall under the exclusion. ECF No. 145, at PageID.5861.  While the court recognizes that exclusions must be construed narrowly, it cannot adopt a construction at war with the language of the exclusion.  And nothing in the language of the failure-to-conform exclusion would support an artificial "magic words" approach.[8]  Nor is it obvious how a court would draw an administrable line between express and implied statements of quality.  The sounder approach is instead to assess whether settled claims in fact asserted that injuries arose from a label that made a statement of quality, whether expressly or implicitly.  Here they did.

---

[8]    Nor does precedent support MNS's proposed approach.  MNS cites *Elcom Techs. v. Hartford Ins. Co.*, 991 F. Supp. 1294 (D. Utah 1997), but that decision nowhere endorsed a "magic words" approach.  It merely held that a company was alleged to have wrongfully advertised that its product was "patented," but where there was no allegation "that the quality of [the company's] product failed to rise to the level advertised," there was no failure to conform to a statement of quality.  *Id.* at 1298.  In this case, by contrast, the *Corker* lawsuit plaintiffs have made numerous allegations to the effect that MNS's coffee products failed to conform to the quality expected of genuine Kona coffee products.

But MNS disputes whether the *Corker* lawsuit plaintiffs' injuries truly stemmed from the alleged failure of MNS's products to conform to the quality expected of Kona coffee.  It argues that the plaintiffs' "alleged injuries . . . would exist regardless of the quality or performance of Mulvadi coffee," ECF No. 145, at PageID.5863, and that "plaintiffs' alleged injuries and damages did not depend on the actual quality or performance of the Mulvadi coffee," *id.* at PageID.5864.  That is simply not correct.  A foundational premise of the *Corker* lawsuit was that Kona coffee is of superior quality, consumers pay a premium for that coffee because of that expected quality, and that by selling products labeled as "Kona" that failed to conform to the quality standards of Kona coffee, MNS and Mulvadi undermined the goodwill and premium price point of the real thing.  If MNS and Mulvadi had sold coffee that conformed to the quality standards of Kona coffee—which, according to the allegations in the *Corker* lawsuit, they could only have done by selling the real thing—there would have been no injury at all.

As a final salvo, counsel for MNS asserted at the hearing on these motions that the *Corker* lawsuit plaintiffs would not have been able to prove, at any trial, that Kona coffee is in fact of a higher quality.  Counsel pointed out that the plaintiffs did not conduct taste tests or consumer surveys of the sort that might have supported an argument about quality.  This argument falls short.  As MNS's counsel conceded at the hearing, MNS did not identify in its written briefing anything in the record of the *Corker*

lawsuit that would support the assertion that the plaintiffs there had abandoned or

lacked the ability to prove their allegations about the superior quality of Kona coffee.

And at the hearing, MNS's counsel could not identify anything in its written briefing to

support the suggestion that the *Corker* lawsuit plaintiffs had no ability to prove, for

example, their allegation that they were injured by MNS's passing off of commodity

coffee as Kona coffee precisely because a "consumer who tries that inferior product,

thinking it is Kona coffee, will conclude that Kona coffee is not worth a premium price"

and "will be unwilling to pay a premium price for Kona [coffee] in the future."  ECF

No. 131-12, at PageID.5166.  Indeed, MNS had not made any argument about Kona

coffee supposedly lacking high quality—or the *Corker* lawsuit plaintiffs being unable to

prove otherwise—until the hearing.  The assertion is therefore both unsubstantiated

and forfeited.  *See Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 n.4 (9th Cir. 2016).

And the assertion is contradicted by Allied World's briefing, which identified

two expert reports in the *Corker* lawsuit that "affirm[ed] that the use of the term 'Kona'

reflected a statement of quality."  ECF No. 128-1, at PageID.4079.  One of those reports

specifically opined "on how the geographical location of production of a product . . . is

intended to signal quality," and further noted that the Kona coffee "has historically

carried a reputation for high quality."  ECF No. 128-1, at PageID.4079.  While MNS

could have sought to persuade the factfinder in the Western District of Washington that

Kona coffee is nothing special and that its reputation for high quality is undeserved, it

chose instead to resolve its litigation risk through a settlement agreement. And so "in all possible worlds," *J. Lamb, Inc.*, 100 Cal. App. 4th at 1039, this court must conclude that MNS settled claims that fell within the failure-to-conform exclusion.

For these reasons, the court concludes that the failure-to-conform exclusion applies, and it "negate[s] coverage . . . even though the coverage provisions would otherwise afford coverage." 1 New Appleman Law of Liability Insurance § 3.03[3] (2025).

2. Allied World also argues that another exclusion applies: a first publication exclusion. It contends that because the $12 million settlement flowed from several years of alleged violative conduct that spanned multiple policy years, the settlement amount must be allocated across each of these policy periods. *See* ECF No. 128-1, at PageID.4080-84. And Allied World further argues that there would only be coverage of MNS's liability for the policy period between December 31, 2014 and December 31, 2015, because the later policies exclude coverage for injuries arising out of the publication of material first published in an earlier policy period.

MNS vigorously disputes the allocation and first publication arguments, but given the court's conclusion that the failure-to-conform exclusion fully bars coverage, there is no need to resolve the question of whether the first publication exclusion might have limited the amount of coverage owed. The court therefore declines to resolve that issue.

41

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment on its declaratory judgment claim and on Defendant's counterclaim for breach of contract is GRANTED and Defendant's cross-motion for summary judgment is DENIED.

As indicated in the court's earlier bifurcation order, ECF No. 90, a status conference will be set to discuss scheduling for Defendant's remaining counterclaim, including the setting of a trial date and the commencement of discovery.

IT IS SO ORDERED.

DATED:  July 3, 2025, at Honolulu, Hawai‘i.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

---

Civil No. 22-00469 MWJS-WRP; *Allied World Nat'l Assurance Co.* et al. *v. NHC, Inc.*;
ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT